IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>HECTOR DIAZ PEREZ,<br><br>                    Defendants. | **4:20CR3066**<br><br><br>**FINDINGS, RECOMMENDATION,<br>AND ORDER** |

Defendant Hector Diaz Perez has moved to suppress all physical evidence and observations of law enforcement officers arising from the traffic stops and a search of the vehicle he was driving on January 9, 2020. (Filing No. 58). Defendant argues the stop, seizure, and arrest of Defendant violated the Fourth Amendment.[1] For the reasons discussed below, the motion should be denied.

## FACTUAL FINDINGS

Defendant's motion to suppress addresses two traffic stops which occurred less than four hours apart. The factual findings related to these stops are based predominantly on the video recordings received into evidence. The officers who initiated the traffic stops, Nebraska State Patrol Troopers Nathan A. Schulz and Nathan Avery, testified at the hearing. Their testimony was consistent with the video recordings and credible. In addition, Trooper Chris J. Colindres, who is fluent in Spanish, provided credible testimony regarding his understanding of the conversation, in Spanish, between Perez and co-defendant Abel Perez Valdivia

---

[1]     The motion references suppression under the Fifth Amendment, but Defendant's brief does not mention any alleged unlawful custodial interrogation or involuntary statements. Defendant's Fifth Amendment claims, if any, are therefore deemed abandoned.

while they were seated in Trooper Schulz' vehicle. As relevant to the issues raised in the motion to suppress, the undersigned magistrate judge finds as follows.

On January 8, 2020, at approximately 9:45 p.m., Trooper Schulz saw an eastbound silver 2020 Chevy Silverado with California license plates change lanes at mile marker 187 on Interstate 80 near Ogallala, Nebraska. The driver did not signal 100 feet prior to changing lanes. Trooper Schulz initiated a traffic stop.

He approached the passenger side of the vehicle and requested the driver's license, the passenger's identification, proof of insurance, and the vehicle's registration. The driver, co-defendant Abel Perez Valdivia, was not licensed to drive and produced a consular card as identification. Defendant Perez produced his driver's license. The vehicle was a rental, with the rental agreement located only on Defendant Perez' cell phone. The Trooper noticed there was very little luggage in the vehicle, and that the rental agreement indicated the vehicle was rented on January 7, 2020 and was due back in California on January 11, 2020.

Trooper Schulz retained Valdivia's consular card and Perez' license and cell phone. He asked Valdivia to exit the pickup and be seated with the officer in his patrol vehicle. Valdivia complied. While in the patrol vehicle, Trooper Schulz began the process of gathering information and completing a warning ticket. As he waited for information from dispatch regarding the vehicle registration, Perez' license, and any criminal history for the vehicle occupants, Trooper Schulz had a conversation with Valdivia regarding the origin, destination, and purpose of Valdivia's trip. Valdivia stated the vehicle was rented in California, and he and Perez were travelling to Chicago to see it for the first time. He explained he met Perez two or three years ago at work.

2

The cell phone's screen went dark, so the officer could not see the rental agreement. He approached Perez on the passenger side of the pickup and asked Perez to reopen the phone. While there, he asked Perez about the trip. Perez stated he and Valdivia were coming from California and were heading to Iowa. He stated he had known Valdivia since October, a little over a year before.

The traffic stop was somewhat delayed because the officer could not immediately check for wants, warrants, and criminal history for Valdivia—Trooper Schulz had difficulty reading Valdivia's identification card, which was written in Spanish. In addition, Perez' mobile phone timed out and had to be reopened to review the rental agreement, obtain the pickup's VIN and then check if it was stolen. Despite these delays, the stop itself was completed in less than 30 minutes. (Ex. 1, 01E . . . 03001i100.avi (512,249 KB) at 30-29:00:00). During the stop, and prior to handing Valdivia a warning ticket, the officer focused solely on gathering information to promptly complete the traffic stop.

After handing the warning ticket to Valdivia, Trooper Schulz asked Valdivia if he was willing to answer a few questions. Valdivia indicated that he was. The trooper asked if there were guns, weapons, drugs, or large amounts of currency in the vehicle. Valdivia stated none of those items were present. Trooper Schulz asked for consent to search the vehicle, and Valdivia consented. Trooper Schulz then asked Perez for consent to search his bag. Perez consented. (Id. at 30:10-32:30). Perez was then seated in the rear seat of the patrol vehicle.

Trooper Schulz conducted a vehicle search that lasted approximately 30 minutes. He did not find drugs in the vehicle.

3

Trooper Schulz allowed Valdivia and Perez to continue their trip, instructing them that Perez must drive because Valdivia did not have a license.

Due to the implausible trip explanation and the conflicting stories provided by Valdivia and Perez, Trooper Schulz believed he had missed something while searching the vehicle. He downloaded a recording of the conversation between Valdivia and Perez which occurred within the patrol vehicle while the officer was conducting the search. Trooper Schulz contacted Trooper Chris J. Colindres to interpret what was said because the conversation was conducted in Spanish. Trooper Colindres, who was located at the patrol's station in North Platte, agreed to do so.

Using headphones to clearly hear the audio, Trooper Colindres listened to and translated the conversation. During the in-car conversation, Perez, who was in the rear seat of the patrol vehicle, pressed his face against the glass partition and watched Trooper Schulz conduct the search. Based on Trooper Colindres' Spanish-to-English translation of the conversation:

- Perez initially stated, "I hope the fucking dog doesn't come." ([Filing No. 81](), audio file, 1:16:00–1:19:37; 1:38:00–1:43:45).[2]

- Perez and Valdivia compared the answers they had provided to Trooper Schulz' questions, noting that Valdivia had stated they were heading to Chicago and had known each other for two or three years,

---

[2]    Throughout the cross-examination of Trooper Colindres, defense counsel's questioning included his personal Spanish-to-English interpretation of what Perez and Valdivia said. A lawyer cannot ethically serve as both the witness and the attorney in a case, and an attorney's questions are not evidence. As such, defense counsel's translation of the conversation was disregarded.

while Perez had stated they were heading to Iowa and had known each other since October. (<u>Id</u>. at 1:20:0–1:21:30; 1:25:00–1:27:00).

- Perez repeatedly asked, "What are we going to do?" Valdivia responded, "We'll see what happens." Perez stated, "We don't know anything," and asked, "Did he find it?" Valdivia responded, "No." (<u>Id</u>. at 1:21:50–1:23:15).

- Perez asked, "Who's going to get me out?" (<u>Id</u>. at 1:35:00–1:36:15).

- The two discussed what they were now going to do. Perez suggested that they would ask Trooper Avery for information of how to find a hotel. Perez commented that they were still four to five hours from their destination, and Valdivia responded that they would arrive there tomorrow morning. (<u>Id</u>. at 1:27:15–1:28:45).

- As Trooper Schulz was returning to the vehicle, and realizing Trooper Schulz had found nothing, Perez leaned back in his seat and stated, "We're good. Stay calm." (<u>Id</u>. at 1:29:00–1:30:00).

Based on these statements, Trooper Colindres told Trooper Schulz that Schulz was correct; something had been missed during the search. The troopers estimated where the vehicle would now be on Interstate 80, and noting Trooper Avery was in that vicinity, promptly notified Trooper Avery by cellphone to look for an eastbound silver Chevy Silverado with California plates suspected to be involved in illegal activity. Schulz explained that he had conducted a traffic stop with two people in that rental pickup, and he had searched the vehicle but found nothing, but based on the conversation within the vehicle during the stop, something illegal was missed during his search.

Shortly after 1:00 a.m. on January 9, 2020, while speaking with Trooper Schulz, Trooper Avery saw the eastbound Chevy Silverado travelling between Interstate 80 mileposts 272 and 275 near Kearney, Nebraska. After seeing the pickup cross the fog line onto the shoulder, he activated his in-car camera and began following it, with the trooper's vehicle offset to the left and behind the pickup. The pickup slowed to 65 miles per hour, and the driver activated the right turn signal well in advance of an upcoming exit. After seeing the vehicle swerve over the fog line a second time, Trooper Avery initiated a traffic stop.

Perez was driving the vehicle; Valdivia was a passenger. Trooper Avery noticed energy drinks in the vehicle. He looked at the fuel gauge and noted the vehicle's gas tank was full. The officer asked for Perez' driver's license, Valdivia's identification, proof of insurance, and the vehicle's registration. Perez was then asked to exit the vehicle and sit in the patrol car.

While in the patrol vehicle, Trooper Avery began the process of collecting information to write a warning ticket. He contacted dispatch to check Perez' driver's license and the vehicle's registration, and to check for wants, warrants, and any criminal history for both Perez and Valdivia. While awaiting information, he asked Perez about the origin, destination, and purpose of his trip. During that conversation, Perez explained he intended to pull off at the exit to get fuel and he was looking for a hotel. Trooper Avery suspected these statements were not true: The vehicle's gas tank was full, and Perez and Valdivia had recently passed exits for Kearney, Nebraska with both gas stations and hotels.

Trooper Avery noticed the vehicle was rented on January 7, 2020 at 1:00 p.m., and it was due to be returned in California on January 11, 2020. Based on the distance between the California rental facility and the location of the stop

6

(Kearney, Nebraska), Trooper Avery concluded Perez and Valdivia were travelling with very few stops. Trooper Avery asked Perez where he was going. Perez claimed they were heading to Chicago for vacation, but he denied knowing anyone in that area and stated he had no lodging or activity plans for his Chicago visit. Since Chicago was another eight hours from the scene of the traffic stop, Trooper Avery knew Perez and Valdivia would have to immediately turn around at Chicago and head back to California if the rental was to be returned on time. Trooper Avery asked why Perez had rented a pickup. Perez explained he wanted something with all-wheel-drive, and his only rental option with that feature was a pickup. Perez stated he owned a Subaru sports vehicle. The officer noted that plane tickets would have been cheaper than renting a pickup, particularly with its low gas mileage.

The interaction between Trooper Avery and Perez was conversational and friendly. When Trooper Avery asked about the Chicago trip, Perez guided the discussion away by stating he was previously employed as a security guard. Perez also stated Valdivia worked for him, then quickly corrected himself and stated Valdivia worked with him.

Dispatch reported that Perez had a criminal history for assault and carrying a concealed weapon. Once this report was received, Trooper Avery completed the warning ticket. As it was printing, he approached the pickup to return Valdivia's consular card. He asked Valdivia where they were heading. Valdivia responded that they were travelling to Chicago.

Trooper Avery returned to the patrol vehicle and handed Perez the warning ticket and Perez' driver's license. Approximately 20 minutes and 30 seconds had passed from the time Trooper Avery activated his lights to the moment he issued the warning ticket. (Ex. 2, 01E . . . 36001i100.avi, (785,775 KB), at 3:30-23:57).

7

As Perez began to exit the patrol vehicle, Trooper Avery asked additional questions. Without any objection or hesitance, Perez sat down and answered the questions, responding that there were no drugs, guns, or large amounts of currency in the vehicle. Trooper Avery asked for consent to search the vehicle. Perez granted consent. At this point, only 22 minutes had passed since the traffic stop was initiated. (Id. at 25:20).

During the stop, the trooper was consistently focused on completing the traffic stop. No promises or threats were made to secure Perez' consent to search. Trooper Avery never brandished a weapon. Perez appeared to understand everything that was being said, responded appropriately to questioning, and never asked to stop the conversation. Although another officer was at the traffic scene, only Trooper Avery was in the patrol vehicle and communicating with Perez, and that conversation was polite and professional at all times. Perez was not told he was free to leave, but the officer did not stop him from leaving the patrol vehicle after the warning ticket was issued.

The pickup was searched. Less than 20 minutes after the search began, and moments before a drug dog arrived at the scene, the officers found illegal drugs hidden under the steering column. (Id. at 44:30). Perez was arrested.

ANALYSIS

Perez argues: 1) the traffic stops were illegal;[3] 2) the detentions during the stop were not supported by reasonable suspicion or probable cause; 3) the length of detention was excessive; 4) "Trooper Avery indicated that he was

---

[3]     Defendant's briefing does not directly challenge the first traffic stop but based on the court's liberal interpretation of that briefing and defense counsel's representations at the close of the hearing, the court will address both traffic stops.

finished writing the warning but did not allow Defendant to leave the patrol car," (Filing No. 58, ¶ 13); and 5) "[a]ny and all perceived permission to search Defendant's rental vehicle was obtained as a result of Defendant's unlawful seizure and is thus tainted." (Filing No. 58, ¶ 21).

Starting from the first traffic stop, the undersigned magistrate judge will chronologically address each of Perez' contacts with law enforcement during the traffic stops initiated on January 8 and 9, 2020.

A.    January 8, 2020 Stop, Detention, and Vehicle Search

1)    Traffic Stop by Trooper Schulz

"[I]f police observe a traffic violation, no matter how minor, there is probable cause to stop the vehicle." United States v. Fuehrer, 844 F.3d 767, 772 (8th Cir. 2016). Nebraska law requires a driver to activate a turn signal not less than 100 feet before changing lanes. Neb. Rev. Stat. § 60-6,161; United States v. Robledo, 185 F. App'x 556, 557 (8th Cir. 2006) (interpreting Neb. Rev. Stat. § 60-6,161).

Here, Trooper Schulz saw the Chevy Silverado occupied by Perez move from one lane to another on the interstate without signaling one hundred feet in advance of the lane change. Upon witnessing this traffic violation, Trooper Schulz had probable cause to initiate the traffic stop.

2)    Prolonged Detention

"A traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket."

Rodriguez v. United States, 575 U.S. 348, 354–55 (2015) (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)). However, "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" Rodriguez, 575 U.S. at 355 (quoting Caballes, 543 U.S. at 408). These inquiries typically include somewhat time-consuming tasks related to the traffic violation, including running a computerized check of the vehicle's registration and insurance; running a similar check of the occupants' identification documents and criminal histories; preparing the traffic citation or warning; and asking the occupants about their destination, route, and purpose. United States v. Cox, 992 F.3d 706, 710 (8th Cir. 2021). See also, Rodriguez, 575 U.S. at 355; United States v. Barragan, 379 F.3d 524, 528 (8th Cir. 2004).

After reviewing the video recording of the traffic stop, I find nothing indicating Trooper Schulz delayed the stop by pursuing matters unrelated to its purpose. Even assuming the stop lasted longer than expected, any delay was caused by factors beyond the officer's control, including trying to read a consular card written in Spanish for a driver who had no license, and having to re-approach Perez to have his phone opened so the rental agreement was displayed. "All of these tasks were within the mission of 'address[ing] the traffic violation that warranted the stop.'" United States v. Navarette, 996 F.3d 870 (2021) (quoting Rodriguez, 575 U.S. at 354). And "[w]hen complications arise while carrying out the tasks associated with completing the traffic stop, 'police may reasonably detain a driver for a longer duration than when a stop is strictly routine.'" Navarette, 996 F.3d at 874 (quoting United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir. 2007)). Moreover, if the driver's responses to the officer's questions, the circumstances of the stop, and the observations of the officer raise suspicions unrelated to the traffic offense, the officer may broaden his inquiry to either affirm or dispel those suspicions. An officer may also question a vehicle's passengers to verify information provided by the driver, and

conflicting stories may justify expanding the scope of the stop and detaining the occupants. Barragan, 379 F.3d at 529.

Almost immediately after contacting the vehicle occupants, Trooper Schulz saw the rental agreement and noticed the vehicle was rented for only four days, was less than a day and a half into that rental period and already a 24-hour drive from the rental location, and the vehicle was heading even further east. Then, upon asking permissible questions about the origin, purpose, and destination of the trip, he received significantly conflicting stories regarding the trip destination and how Perez and Valdivia knew each other. And whether the destination was Iowa or Chicago, visiting either of those destinations (especially Chicago) was inconsistent with having the vehicle returned to a California rental agency by January 11, 2020. These facts raised red flags indicating the vehicle occupants were engaged in criminal activity unrelated to the traffic offense. Trooper Schulz did not unlawfully detain Perez by prolonging the stop to investigate his reasonable suspicion that criminal conduct was afoot. See e.g., Cox, 992 F.3d at 710 (holding vehicle occupants' demeanor, nervousness, and inconsistent stories justified expanding the scope beyond the traffic stop and prolonging the stop to investigate).

3)     Post-stop Detention

After a warning ticket was handed to Valdivia, Trooper Schulz asked if Valdivia was willing to answer some questions. This request and any delay it may have caused was wholly appropriate given the reasonable suspicion developed during the course of the stop. And in any event, Valdivia stated he was willing to answer additional questions. Upon review of the video, this consent was freely and voluntarily given.

Valdivia answered Trooper Schulz' inquiries regarding possession of guns, drugs and currency, and he denied the presence of any of those items in the vehicle. Trooper Schulz then asked for consent to search the vehicle. Valdivia consented. The trooper then approached Perez and requested consent to search his bag. Perez also consented. As confirmed by the video, these consents to search were also knowingly and voluntarily given. All conversations between the officer and the vehicle occupants were courteous. Valdivia and Perez both appeared to understand what the officer was requesting, neither expressed any hesitance in granting consent, and the officer made no threats or promises to obtain those consents.

A 30-minute search was conducted. The video (Ex. 1, 01E . . . 03001i100.avi) confirms that Trooper Schulz actively and expeditiously conducted the search, focusing solely on that task while it was being completed. The detention following the issuance of a warning ticket was not prolonged or excessive in violation of the Fourth Amendment.

B.     January 9, 2020 Stop, Detention, and Vehicle Search

1)     Traffic Stop by Trooper Avery

Defendant Perez argues Trooper Avery did not see Perez commit a traffic violation and therefore lacked probable cause to stop the pickup during the early morning hours of January 9, 2021. This argument fails for two reasons: a) based on the credible evidence, Perez violated Neb. Rev. Stat. § 60-6,142 by crossing the fog line as he was driving; and b) based on the information relayed to Trooper Avery by Trooper Shultz, Trooper Avery had reasonable suspicion sufficient to justify an investigatory stop of the vehicle.

12

a)      Violation of § 60-6,142

Under Nebraska law, "any crossing of the fog line, even momentarily and inadvertently crossing onto the shoulder, is enough to violate" the Nebraska rules of the road. State v. Magallanes, 284 Neb. 871, 876, 824 N.W.2d 696, 700 (2012) (interpreting Neb. Rev. Stat. § 60-6,142 ("No person shall drive on the shoulders of highways . . . . "); See also, State v. Ellwanger, No. A-17-1318, 2018 WL 5809844, at *3 (Neb. Ct. App. Nov. 6, 2018) ("Driving on the shoulder is also a law violation, even if the line is barely crossed.").[4] See also, State v. Jasa, 297 Neb. 822, 901 N.W.2d 315 (2017) (holding the officer's testimony that he observed the vehicle tires cross a lane line supported a finding of a municipal traffic violation, even though video recording of the incident was not entirely clear).

Based on Trooper Avery's credible testimony, Perez drove the pickup across the fog line twice; once before the patrol vehicle's camera was activated, and a second time after the recording began. Irrespective of whether Trooper Avery's actual motive was to search the vehicle, the violation of Neb. Rev. Stat. § 60-6,142 provided probable cause to stop the vehicle. Whren v. United States,

---

[4]      Defense counsel repeatedly questioned Trooper Avery about the trooper's knowledge of Nebraska case law discussing the application of Neb. Rev. Stat. § 60-6,142 in the context of vehicles equipped with dual tires. This questioning, and particularly its tone, strongly implied that under the Nebraska Court's interpretation of Neb. Rev. Stat. § 60-6,142, Perez did not violate the statute since his pickup was equipped with "dualies." This questioning, wholly unsupported by the law, was highly misleading to the witness, opposing counsel, and the court.

The undersigned magistrate judge has reviewed every Nebraska appellate court case available on Westlaw and Lexis which cites Neb. Rev. Stat. § 60-6,142. When applying Neb. Rev. Stat. § 60-6,142, Nebraska has adopted no exception or allowance for vehicles equipped with dual tires that cross the fog line. In fact, the only Nebraska appellate case interpreting § 60-6,142 and involving a vehicle with dual tires, State v. Medina, No. A-11-377, 2011 WL 2577268, at *1 (Neb. Ct. App. June 28, 2011), holds that "even where a portion of a vehicle is driven on a shoulder for only a brief period over a short distance, the driver of the vehicle has violated § 60–6,142." The reasoning in Medina was extensively cited and fully adopted by the Nebraska Supreme Court in State v. Magallanes, 284 Neb. 871, 876, 824 N.W.2d 696, 701 (2012).

517 U.S. 806, 813 (1996); Fuehrer, 844 F.3d at 772 (holding that if an officer has probable cause to initiate a vehicle stop for a traffic violation, the officer's alleged ulterior motivation to search for drugs was irrelevant).

b)   Investigatory Stop

Even in the absence of a traffic violation, law enforcement may lawfully stop a vehicle based on reasonable suspicion that the vehicle is being used to commit a crime. The Fourth Amendment permits an investigative stop of a vehicle when officers reasonably suspect that the vehicle or its occupants are involved in criminal activity. United States v. Smith, 648 F.3d 654, 658–59 (8th Cir. 2011). When reasonable suspicion exists, officers may briefly stop an individual and make reasonable inquiries aimed at confirming or dispelling their suspicion. Id.

The court considers the totality of the circumstances when deciding whether there is a reasonable basis for suspecting criminal activity. Id. The officers' suspicion must be based on particularized, objective facts which, along with rational inferences from those facts, reasonably warrants suspicion that a crime is being committed. Id.

Every officer need not have observed the suspicious conduct to perform a lawful investigatory stop. Navarette v. California, 572 U.S. 393, 397 (2014) ("We have firmly rejected the argument that reasonable cause for an investigative stop can only be based on the officer's personal observation, rather than on information supplied by another person."); United States v. Mora-Higuera, 269 F.3d 905, 910 (8th Cir. 2001) (An officer "may rely on information provided by other officers as well as any information known to the team of officers conducting the investigation." (quoting United States v. Thomas, 249 F.3d 725, 728 (8th Cir.

2001))). When multiple officers are communicating and working together, reasonable suspicion and probable cause are premised on the officers' collective knowledge. United States v. Gillette, 245 F.3d 1032, 1034 (8th Cir. 2001) ("Where officers work together on an investigation, we have used the so-called 'collective knowledge' theory to impute the knowledge of one officer to other officers to uphold an otherwise invalid search or seizure.") If an officer who has reasonable suspicion of criminal activity instructs other officers to conduct a stop, the traffic stop is lawful under the Fourth Amendment even if the officers conducting the stop are wholly unaware of the underlying facts. United States v. Jacobsen, 391 F.3d 904, 906-07 (8th Cir. 2004) (affirming denial of a motion to suppress because the agent who ordered the traffic stop had reasonable suspicion of criminal activity).

Here, the collective knowledge of Troopers Schulz, Colindres, and Avery provided an articulable basis for suspecting the Chevy Silverado driven by Perez was carrying illegal drugs. Perez and Valdivia had responded to Trooper Schulz' questions with inconsistent stories and implausible travel plans. Schulz provided the recording from his in-car camera to Trooper Colindres, who then translated the Spanish conversation to English. According to that conversation, while watching Trooper Schulz search the pickup, Valdivia and Perez expressed concern that a dog would arrive at the scene, and what they were going to do now that the vehicle was being searched. Perez asked if the officer had "found it." Perez and Valdivia compared the stories they provided to Trooper Schulz and planned what they were going to say when the officer returned to the patrol vehicle (e.g., calmly ask for directions to a hotel, claim they had no knowledge of the vehicle's contents, etc). And when they realized Trooper Schulz had not found anything during the search, Valdivia and Perez both expressed their relief, with Perez leaning back and stating "We're good. Stay calm."

15

Based on this conversation, Perez and Valdivia were worried that Trooper Schulz would find what they were transporting in the pickup, and, given Perez' stated concern that a canine would arrive at the scene, it was likely they were transporting drugs. That message, along with the description of the vehicle, was relayed from Troopers Schulz and Colindres to Trooper Avery. And when Trooper Avery saw the pickup, he stopped it.

Collectively, Troopers Schulz, Colindres, and Avery had reasonable suspicion to believe Perez and Valdivia were using the Chevy Silverado to transport illegal drugs. This reasonable suspicion justified an investigatory stop of the vehicle by Trooper Avery.

2)     Post-stop Detention

After initiating the traffic stop, Trooper Avery performed the routine tasks associated with the traffic violation: checking Perez' license, Valdivia's identity, any proof of insurance, and the vehicle's registration; checking the occupants' criminal history, and whether they are the subjects of outstanding wants and warrants; and while collecting this information, engaging in general discussion about the origin, purpose, and destination of the trip. All such tasks, and the time taken to perform them, were reasonable and appropriate to the traffic stop. More importantly, based on the information from Troopers Schulz and Colindres, Trooper Avery had reason to believe Perez was engaged in criminal activity from the outset of the traffic stop, and the troopers' reasonable suspicion was further bolstered by Trooper Avery's additional observations and investigation, including:

- Perez' change in speed and his attempt to leave the interstate when Trooper Avery began following him;

16

- his statement that he was looking for gas even though the gas tank was full;

- his statement that he was looking for a hotel when he had just passed exits with both gas stations and hotels;

- Perez' rental of a pickup for a four-day roundtrip from California to Chicago for vacation, when driving was significantly more expensive and allowed minimal, if any, time to actually visit the city;

- Perez' failure or inability to provide any information on what or who he intended to see, or where he intended to stay in Chicago;

- Perez' attempt to divert the conversation away from the Chicago trip by trying to look like a law enforcement colleague—a "good guy" working as a security guard; and

- Perez' criminal history.

Having not only the traffic stop to process, but also reasonable suspicion of ongoing criminal activity, Trooper Avery was allowed to investigate beyond the scope of the traffic stop itself and to detain for a reasonable time while attempting to obtain further information. Smith, 648 F.3d at 659. Trooper Avery focused on the task at hand and did not divert his attention to other matters. In fact, the warning ticket was handed to Perez within 20 minutes after initiating the traffic stop.

As Perez began leaving the patrol vehicle, Trooper Avery began asking additional questions. Perez argues he was unlawfully detained when "Trooper Avery indicated that he was finished writing the warning but did not allow Defendant to leave the patrol car," (Filing No. 58, ¶ 13). But at that point, Trooper Avery had ample reason to believe Perez was engaged in criminal activity, and with or without Perez' consent, detaining Perez to conduct a vehicle search did not violate the Fourth Amendment. United States v. Pacheco, 996 F.3d 508, 512

17

(8th Cir. 2021) (finding reasonable suspicion of criminal activity justified extending a traffic stop where the short vehicle rental period was inconsistent with the stated travel plans, the driver chose to rent a vehicle at substantial expense, vehicle occupants gave vague and confusing answers to routine questions about their travel plans, and the driver appeared to be attempting to travel without making many stops).

3)   Vehicle Search

Perez argues "[a]ny and all perceived permission to search Defendant's rental vehicle was obtained as a result of Defendant's unlawful seizure and is thus tainted." (Filing No. 58, ¶ 21). But there was no unlawful seizure—either prior to or during the vehicle search.

When asked if officers could search his vehicle, Perez said "yes." (Ex. 2, 01E . . . 36001i100.avi, at 25:20). He was not hesitant, or in any way coerced to do so. The consent was voluntary. Any detention while the search was being conducted, and the consensual search of the Chevy Silverado, did not violate the Fourth Amendment.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable John M. Gerrard, United States District Judge, pursuant to 28 U.S.C. § 636(b), that the motion to suppress filed by the defendant (Filing No. 58) be denied in its entirety.

The defendant is notified that failing to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

IT IS ORDERED that the jury trial of this case is set to commence before John M. Gerrard, United States District Judge, in Courtroom 1, United States Courthouse, Lincoln, Nebraska, at 9:00 a.m. on **November 22, 2021**, or as soon thereafter as the case may be called, for a duration of three (3) trial days.  Jury selection will be held at the commencement of trial.

October 13, 2021.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

19